## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

KATHERINE CUTRONE, MICHAEL W. SMUTZ, STAN G. SMITH, MARY ELLEN MORGAN, EDDIE D. YOUSIF, MARY BETH AM RHEIN, and VALERIE REINECKE, *individually and on behalf of all others similarly situated*,

Plaintiffs,

v.

THE ALLSTATE CORPORATION, THE ALLSTATE 401(K) COMMITTEE, THE ALLSTATE 401(K) ADMINISTRATIVE COMMITTEE, and DOES 1-30,

Defendants.

Case No. 20 CV 6463

Hon. Georgia N. Alexakis

## MEMORANDUM OPINION AND ORDER

Plaintiffs Katherine Cutrone, Michael W. Smutz, Stan G. Smith, Mary Ellen Morgan, Eddie D. Yousif, Mary Beth Am Rhein, and Valerie Reinecke participated in a retirement plan offered through their employer, The Allstate Corporation ("Allstate"). They bring this suit against Allstate, the committees that managed the plan, and the individual members of those committees for breach of fiduciary duty and prohibited transactions under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*

Defendants have moved for summary judgment on all counts pursuant to Federal Rule of Civil Procedure 56. [136]. For the reasons that follow, the Court grants defendants' motion for summary judgment in full.

## BACKGROUND

Unless otherwise noted, the facts that follow are undisputed by the parties.

Allstate sponsors a large defined-contribution retirement savings plan ("the plan") for its employees and their beneficiaries. [168] ¶ 2. Plan participants can select between any number of investment options made available as part of the plan, including (most relevant to this litigation) investment options known as target date funds ("TDFs"). [155] ¶¶ 27–28. In 2014, the plan had nearly $4.7 billion in assets and more than 40,000 participants. [168] ¶ 2. By the end of 2021, it had grown to manage over $7 billion in assets and more than 60,000 participants. *Id.*

The plan was governed by three different Allstate committees: the 401(k) Committee, the Administrative Committee, and the 401(k) Investment Committee (the "Investment Committee"). [155] ¶ 1. The 401(k) Committee had oversight responsibility for the plan and the Administrative and Investment Committees. *Id.* ¶ 2. The Administrative Committee, a named fiduciary under ERISA, administered the plan and was responsible for carrying out all rules and interpreting and applying all plan provisions. *Id.* ¶ 5. The Investment Committee was a named fiduciary under ERISA "with respect to the investment options available to participants and monitoring investment advisory services and fees." *Id.* ¶ 6.

2

In 2010, defendants selected TDFs offered by Northern Trust to be the plan's default investment option. [168] ¶ 26. TDFs are "diversified investment portfolios" where the asset allocations are gradually adjusted over time to become more conservative as a participant nears the "target date"—or the year the participant intends to retire. [155] ¶¶ 37–38. The adjustment of asset allocations is known as a fund's "glidepath." *Id.* ¶ 38. Northern Trust's TDFs were offered in a pre-selected suite of "vintages," which are TDFs corresponding to a particular target date (*e.g.*, 2045 vintage). [44] ¶ 52.

The Northern Trust TDFs were designed shortly after the 2008 financial crisis with the goal to provide both growth and downside protection. [155] ¶ 144; [166-8] Def.'s Ex. 173 at 169:16–170:5; Def.'s Ex. 38 at ALL0005776. Compared to other TDFs, Northern Trust's TDFs included lower allocations to equity overall. [144-1] Def.'s Ex. 35 ¶ 64. And of their equity allocations, the Northern Trust TDFs included relatively higher allocations to international equities. *Id.* ¶ 74. Northern Trust's TDFs also included allocations to real estate and commodities to diversify across asset classes. *Id.* ¶ 68; [155] ¶ 42. By 2020, plan participants had invested roughly $872 million in assets in the Northern Trust TDFs. [168] ¶ 2.

The Investment Committee Charter required the committee to meet at least quarterly to review all the investment options it offered to plan participants. [155] ¶ 15. In addition to these quarterly meetings, Northern Trust's investment managers presented a report on their funds to the Investment Committee at least once per year. *Id.* ¶ 16. Defendants also engaged the services of two outside investment

consultants—Mercer and Willis Towers Watson—to evaluate the plan's offerings. *Id.* ¶¶ 17–19. Mercer provided plan-review reports to defendants in 2012 and 2013, 2015 and 2016, and 2019 through 2021, while Willis Towers Watson provided similar reports in 2017 and 2018. *Id.* ¶ 63. Although defendants engaged these consultants for plan reviews most years and sought their assistance for several one-off projects, the consultants were not retained on an ongoing basis and did not attend the Investment Committee's quarterly meetings. *Id.* ¶¶ 19, 92, 121.

The Investment Policy Statement ("IPS") sets forth that the Northern Trust TDFs' "annualized investment return should be within +/- 20 basis points of the benchmark index over a rolling three-year basis before expenses." *Id.* ¶ 54. To evaluate the TDFs' performance against this goal, defendants compared their returns to a set of custom benchmarks every quarter. *Id.* ¶ 56.[1] These benchmarks were designed to mirror the TDFs' specific asset allocations and the strategic decisions Northern Trust made in adjusting their glidepaths. *Id.* ¶ 55; [168] ¶ 52. During the relevant period, the Northern Trust TDFs consistently performed within a +/- 20 basis point tracking band around their custom benchmarks, as the IPS required, except for a few vintages in 2020. [155] ¶ 59.

In addition to these custom benchmarks, defendants received data from Mercer and Willis Towers Watson comparing the Northern Trust TDFs' returns to industry

---

[1] Although the parties dispute whether it was Northern Trust or Mercer that selected these custom benchmarks, *see* [155] ¶ 56, that dispute is not relevant to the outcome on summary judgment.

"indices" or "universes" of other TDFs. *Id.* ¶ 64.[2] These indices—which contained both actively and passively managed TDFs—varied in their strategies and asset allocations. *Id.* ¶ 65. Broadly speaking, the Northern Trust TDFs underperformed compared to these indices. For example, by the end of 2015, most Northern Trust TDF vintages ranked in the bottom quartile of the peer universe across 1-quarter, 1-year, 3-year, and 5-year performance, with some vintages in the bottom decile. [157-1] Pl.'s Ex. 1 ¶ 226. In 2019, the TDFs' 3-year and 5-year performance ranked in the bottom quartile and at times in the bottom 5% of the peer universe. *Id.* ¶ 235. This underperformance relative to universes of other TDFs is sometimes reflected in the consultants' commentary. For example, in its 2016 presentation, Mercer noted that the Northern Trust TDFs "lagged other passively managed products given their exposure to international equity, high yield fixed income and commodities." [145-1] Def.'s Ex. 59 at ALL0033347.

Mercer and Willis Towers Watson did not recommend any changes to Allstate's plans through 2020. [155] ¶ 150. In 2020, after defendants asked Mercer to analyze the Northern Trust TDFs' glidepath and asset allocations in conjunction with the plan participants' demographics, Mercer suggested that "a more aggressive glidepath warrants consideration." *Id.* ¶ 147. Yet Allstate says it delayed acting that year for several reasons, including the onset of the COVID-19 pandemic and the death of its Plan Administrator. *Id.* ¶ 148.

---

[2] Plaintiffs dispute the comprehensiveness of these analyses, *see id.* ¶ 64, but they do not dispute the fundamental point that some degree of comparative data was provided.

In its annual review the next year, Mercer recommended for the first time that the Investment Committee replace the Northern Trust TDFs with another product. *Id.* ¶ 150.[3] However, that recommendation came after Northern Trust already had announced its plan to remove its TDFs from the market. *Id.* ¶ 151. Later in 2021, defendants chose a different asset management firm as the plan's new TDF provider. *Id.* ¶ 152.

In addition to investment options, Allstate provided plan participants with professional advisory services—first through Financial Engines, then through Alight Financial Advisors ("Alight") when the plan switched providers in 2017. *Id.* ¶¶ 189–90, 197. These advisory services consisted of two components: online advice services and professional management services. [168] ¶¶ 86, 90. The online advice program charged a flat fee for plan participants to access investment advice via a portal, regardless of whether a participant used the services. [44] ¶ 125. These non-discretionary fees were paid by the plan and then deducted from participants' accounts. [155] ¶ 163. The professional management program charged an asset-based fee in exchange for Financial Engines or Alight to assume discretionary authority over a participant's account and make investment decisions on the participant's

---

[3] Although plaintiffs dispute that it was ever Mercer's responsibility to determine whether a plan should be replaced, *see* [155] ¶ 150, the Court does not understand defendants to be attempting to offload responsibility in such a way. Both parties appear to agree that Mercer's role was simply to inform defendants if it ever believed the Northern Trust TDFs were not a viable option for the plan, *see* [144-1] Def.'s Ex. 36 at 222:6–10, and to make recommendations to the committees on investment options, *see, e.g.*, [145-1] Def.'s Ex. 59 at ALL0172168 (in presentation to defendants related to Northern Trust's TDFs, Mercer recommended that defendants "[m]aintain position" because "product meets original expectations").

behalf. [44] ¶ 125. Until the switch to Alight in 2017, Financial Engines contracted separately with Aon Hewitt, the plan's recordkeeper, to access the data it needed to provide advice to plan participants. [155] ¶ 169.

In October 2020, Cutrone filed a class action complaint against Allstate, the 401(k) Committee, the Administrative Committee, the Investment Committee, and the individual members of these committees (named for now as Does 1-30). [1]. The following March, Cutrone's complaint was deemed related and consolidated with a similar case against Allstate brought by Morgan. [19]. Later that month, Cutrone, Morgan, and five additional plaintiffs (Smutz, Smith, Yousif, Am Rhein, and Reinecke) filed a consolidated amended complaint alleging that defendants (1) breached their fiduciary duty of prudence by retaining the Northern Trust TDFs (Count I); (2) breached their fiduciary duty of prudence by retaining Financial Engines and Alight for advisory services (Count II); (3) engaged in a prohibited transaction under 29 U.S.C. § 1106(a)(1) (Count III); (4) breached their co-fiduciary duty (Count IV); and (5) breached their fiduciary duty to monitor (Count V). *See generally* [20]. Plaintiffs bring these claims both individually and on behalf of all others similarly situated. *Id.* ¶ 1.

According to the consolidated amended complaint, the relevant period for plaintiffs' claims extends from October 30, 2014, to the present for claims related to the Northern Trust TDFs and from January 4, 2015, to the present for claims related

to the advisory services.[4] *Id.* ¶ 157. (The Court refers to this as the "relevant period" because no class has been certified at this point in the litigation.) In June 2024, defendants moved for summary judgment on all counts. [136].

## LEGAL STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it affects the substantive outcome of the litigation, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the nonmoving party, *see Scott v. Harris*, 550 U.S. 372, 380 (2007). The nonmoving party can defeat summary judgment only by showing that a reasonable jury could render a verdict in its favor. *See Anderson*, 477 U.S. at 248. At summary judgment, the Court views the record in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *See id.* at 255.

## DISCUSSION

Defendants argue there is no genuine dispute of material fact as to each of plaintiffs' five counts. The Court addresses each in turn.

---

[4] Although plaintiffs state that the relevant period extends to the present across-the-board, the relevant period for Count I necessarily ended when defendants replaced the Northern Trust TDFs in 2021. [155] ¶ 152.

## A. Duty of Prudence (Counts I and II)

ERISA allows plan participants and beneficiaries to sue for losses when a plan breaches its fiduciary duties. 29 U.S.C. § 1132(a)(2). They may also seek to enjoin ERISA violations or "obtain other appropriate equitable relief" to enforce or redress a fiduciary's violations. *Id.* § 1132(a)(3). Fiduciaries are personally liable for plan losses resulting from the breach of their duties. *Id.* § 1109(a).

ERISA requires a plan fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.* § 1104(a)(1)(B). Because ERISA is "derived from the common law of trusts," *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 570 (1985), "courts often must look to the law of trusts" to determine the contours of an ERISA fiduciary's duty, *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). In the trusts context, "a trustee has a continuing duty to monitor trust investments and remove imprudent ones … separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Id.* "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Hughes v. Nw. Univ.*, 63 F.4th 615, 626 (7th Cir. 2023) (quoting *Hughes v. Nw. Univ.*, 595 U.S. 170, 176 (2022)).

A fiduciary's duty of prudence is both procedural and objective. *See Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 680 (7th Cir. 2014). That is, "[i]n reviewing the acts of [employee stock ownership plan] fiduciaries under the objective prudent person

9

standard, courts examine both the process used by the fiduciaries to reach their decision as well as an evaluation of the merits." *Id.* (quoting *Eyler v. Comm'r of Internal Revenue*, 88 F.3d 445, 455 (7th Cir. 1996)); *see also id.* (courts consider "both the substantive reasonableness of the fiduciary's actions and the prudence by which the fiduciary made its decision"). The duty is "judged by the information available at the time of each investment decision—not by the glow of hindsight." *Pizarro v. Home Depot, Inc.*, 111 F.4th 1165, 1173 (11th Cir. 2024) (citing *Sacerdote v. New York Univ.*, 9 F.4th 95, 107 (2d Cir. 2021)). In other words, "[p]rudence does not mean clairvoyance. The duty does not demand a fiduciary—with the benefit of hindsight—make the optimal investment." *Reetz v. Aon Hewitt Inv. Consulting, Inc.*, 74 F.4th 171, 182 (4th Cir. 2023).

The parties disagree on whether plaintiffs can establish liability based on procedural imprudence alone or whether liability necessarily requires a finding that the investment was objectively imprudent. *Compare* [137] at 16, *with* [158] at 4. To support their respective positions, both parties cite the same language in then-Judge Scalia's concurrence in *Fink v. National Savings & Trust Co.*, 772 F.2d 951 (D.C. Cir. 1985), which reads:

> I know of no case in which a trustee who has happened—through prayer, astrology or just blind luck—to make (or hold) objectively prudent investments (*e.g.*, an investment in a highly regarded "blue chip" stock) has been held liable for losses from those investments because of his failure to investigate and evaluate beforehand. Similarly, I know of no case in which a trustee who has made (or held) patently unsound investments has been excused from liability because his objectively imprudent action was preceded by careful investigation and evaluation. In short, there are two related but distinct duties imposed upon a trustee: to investigate and evaluate investments, and to invest

10

prudently. Neither does the faithful discharge of the first satisfy the second, nor does breach of the first constitute breach of the second.

*Id.* at 962 (Scalia, J., concurring in part and dissenting in part).

The Court deduces two important principles from this language. First, a fiduciary is not automatically deemed to have acted prudently if she satisfies her duty to investigate and evaluate. *Id.* ("Neither does the faithful discharge of the first satisfy the second."). In other words, procedural prudence does not excuse an objectively imprudent investment. Second, no matter how imprudent a fiduciary may be in failing to investigate or evaluate an investment, she cannot be liable if the investment was objectively prudent. *Id.* ("I know of no case in which a trustee who has happened … to make (or hold) objectively prudent investments … has been held liable for losses from those investments because of his failure to investigate and evaluate beforehand."). Put another way, the failure to investigate and evaluate does not necessitate a finding that the investment itself was imprudent. *See also id.* ("[N]or does breach of the first constitute breach of the second.") Although procedural prudence can bear on the question of objective prudence, as then-Judge Scalia summed up: "It is the imprudent investment rather than the failure to investigate and evaluate that is the basis of suit." *Id.*

Plaintiffs thus offer no case to support their suggestion that a defendant may be liable for breach of duty under ERISA based on procedural imprudence alone. This lack of case law makes sense in light of ERISA's loss causation requirement. ERISA provides that a fiduciary is personally liable for "any *losses* to the plan resulting from" a breach of fiduciary duty. 29 U.S.C. § 1109(a) (emphasis added); *see also Peabody v.*

11

*Davis*, 636 F.3d 368, 373 (7th Cir. 2011) (ERISA requires "causation of an injury"). When a fiduciary fails to investigate what was otherwise an objectively prudent investment, there can be no loss to the plan.

In line with this reasoning, other federal courts have required plaintiffs to show that an investment was objectively imprudent despite evidence that might otherwise demonstrate a procedural breach—with some courts framing the requirement as a condition for establishing a breach of duty, and other courts considering it a prerequisite to demonstrating loss or causation. *See Pizarro*, 111 F.4th at 1176 ("[L]iability turns not only on an imprudent process, but also on that process resulting in an imprudent investment."); *Brieger v. Tellabs, Inc.*, 629 F. Supp. 2d 848, 862 (N.D. Ill. 2009) (even if a fiduciary was procedurally deficient, "defendants would still be entitled to judgment on the prudence claim because the evidence shows that a reasonably prudent individual in similar circumstances who undertook such an examination" would have made the same decision to keep the investment option); *accord Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 363 (4th Cir. 2014) (to evade liability, defendant "had to prove that despite its imprudent decision-making process, its ultimate investment decision was 'objectively prudent'"); *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 919 (8th Cir. 1994) (recognizing that even if trustees breached their duties, trustees may avoid liability if there was no loss to the plan).

Thus, even if a reasonable jury could conclude that defendants here acted in a procedurally imprudent manner, defendants may still prevail as a matter of law if

12

they can establish that no genuine factual dispute exists as to the objective prudence of their investment decisions. The Court now proceeds to consider that question.

### 1. **Northern Trust TDFs (Count I)**

As an initial matter, plaintiffs argue that, to establish objective prudence, defendants must show that a hypothetical prudent fiduciary *would* have—not merely *could* have—made the same investment decision. [158] at 42–43 (citing *Roth*, 16 F.3d at 919). This formulation of the relevant standard derives from the Fourth Circuit's opinion in *Tatum*, 761 F.3d at 364. There, the appeals court defined "objective prudence" by requiring a plan fiduciary to demonstrate that it "would have reached the same decision had it undertaken a proper investigation." *Id.* (emphasis added). That a hypothetical fiduciary must reach the *same* decision implies that there is only a single prudent decision a fiduciary may reach.

But this rule is impossible to square with the principle—recognized by other courts, including the Seventh Circuit—that there is a "range of reasonable judgments a fiduciary may make based on her experience and expertise" given the "difficult tradeoffs" a fiduciary often faces. *Albert v. Oshkosh Corp.*, 47 F.4th 570, 575 (7th Cir. 2022) (quoting *Hughes*, 595 U.S. at 177). In rebuffing the "would have" standard, the Eleventh Circuit in *Pizarro* offered the following example:

> [I]magine that, faced with a particular decision, there are three (and only three) reasonable investment choices: A, B, and C. By our read, the *Tatum* majority's rule requires a fiduciary who chose A to show that each and every other prudent fiduciary would have also chosen A, even though B and C were also prudent choices. Because a fiduciary will not be able to make that showing, the *Tatum* rule would impose liability on a fiduciary even though it made an objectively prudent choice—completely contrary to ERISA's loss causation requirement.

13

111 F.4th at 1177 n.4. The Court finds this reasoning persuasive. Ultimately, plaintiffs' iteration "ignore[s] the fact that there is not one and only one 'same decision' that qualifies as objectively prudent." *Tatum*, 761 F.3d at 378 (Wilkinson, J., dissenting).[5] Accordingly, in determining whether defendants have met their summary-judgment burden with respect to objective prudence, the Court will examine whether no genuine factual dispute exists as to whether defendants' decision to retain the Northern Trust TDFs fell within a "range of reasonable judgments a fiduciary may make." *Albert*, 47 F.4th at 575 (quoting *Hughes*, 595 U.S. at 177).

Moving to the merits: The parties have both submitted an expert report to support their arguments on Count I. With respect to the objective prudence of the Northern Trust TDFs, defendants' expert, Russell Wermers, opines that "the Northern Trust TDFs were economically reasonable investment options for the Plan throughout the Review Period," meaning that they provided an "attractive tradeoff between risk and return" given their investment strategy. [144-1] Def.'s Ex. 35 ¶¶ 39, 55. To reach this conclusion, Wermers evaluated the prudence of the TDFs' specific glidepath and asset allocations relative to their goal to provide "downside protection, emphasizing diversification and protection against inflation and market declines." *Id.* ¶ 59. Having done so, he concludes that the Northern Trust TDFs' lower allocations to equity (a "relatively risky asset") were economically reasonable because they were

---

[5] Although the Court disagrees with *Tatum* and *Roth*'s requirement that a hypothetical prudent fiduciary reach the *same* decision as defendants, for the reasons the Court earlier discussed, it agrees with those portions of *Tatum* and *Roth* requiring more than a showing of procedural imprudence for plaintiff to prevail on its ERISA claim. *See supra* at 12.

"consistent with their stated strategy and fulfilled the Plan's preference for a lower level of investment risk for their retirement funds." *Id.* ¶¶ 64, 67. Wermers also asserts that the TDFs' inclusion of allocations to real estate and commodities was economically reasonable because those assets provided diversification benefits and hedged against inflation. *Id.* ¶¶ 68–73. Wermers adds that the Northern Trust TDFs' relatively high allocations to international equities compared to other TDFs was reasonable because they provided diversification benefits and were expected *ex ante* to perform at least as well as domestic equities. *Id.* ¶ 74. Finally, Wermers states that Northern Trust's decision to adopt an upward sloping glidepath was reasonable based on Northern Trust's data, collected from academia and industry, suggesting that the glidepath design "would encourage participants to save more." *Id.* ¶ 86.

Furthermore, Wermers places the Northern Trust TDFs' returns in the context of the prevailing market conditions at the relevant time. Wermers attributes the TDFs' relative *ex post* underperformance compared to peer universes to the stronger-than-expected domestic equity returns during the relevant period. *Id.* ¶¶ 103–07. But he insists that "these *ex post* realized returns do not imply that a fund that allocated assets to international equities, real estate, and commodities was an unreasonable *ex ante* choice for a plan, since such stark differences in returns could not have been knowable *ex ante*." *Id.* ¶ 107. In line with this reasoning, he opines that "[s]witching strategies to a more aggressive TDF after a strong market for risky assets" is an "ill-advised strategy that assumes that trends continue indefinitely … [and] comes with the risk of losses if market conditions change." *Id.* ¶ 105. Accordingly, Wermers

concludes that a fiduciary "should ideally consider a full market cycle when evaluating fund performance." *Id.* ¶¶ 46, 105. Based on his own quantitative analysis, Wermers concludes that, in a period experiencing protracted market downturns, the Northern Trust TDFs would have experienced greater returns than those of alternative TDFs. *Id.* ¶¶ 113–14. At bottom, based on Wermers' work and opinions, a reasonable jury readily could conclude that the Northern Trust TDFs represented an objectively prudent investment decision by defendants.

In seeking to forestall summary judgment, plaintiffs face a significant hurdle: Their expert, Eric Dyson, never opined that the defendants' decision to retain the Northern Trust TDFs was objectively imprudent. At his deposition, Dyson testified that his expert opinions were limited to "process with regard to the Northern Trust TDFs." [167-1] Def.'s Ex. A at 87:12–19; *see also id.* at 88:6–12 ("I don't know if I have another opinion that's outside the scope of process, but my report is focused on process."). When pressed to provide an example of an opinion on the objective prudence of retaining the Northern Trust TDFs, Dyson remarked that he "[could not] come up here with a specific example that's outside of process." *Id.* at 88:10. Other portions of Dyson's deposition underscore that essential testimony. As defendants point out, with accurate (and unrebutted) citations to pertinent deposition pages, "Dyson perform[ed] no independent analyses regarding the Northern Trust TDFs' performance (absolute, relative, or risk-adjusted), asset-allocations, glidepath strategy, capital markets assumptions, or fees." [137] at 28 n.19 (citing [147-1] Def.'s Ex. 92 74:18–81:23; 243:15–23, 246:16–26; 278:2–12). Even a cursory review of

16

Dyson's report confirms that his attention was on the prudence of defendants' process in retaining the funds. *See generally* [157-1] Pl.'s Ex. 1. For instance, all of Dyson's analysis relating to the Northern Trust TDFs falls under a heading which reads: "The Plan Fiduciaries' *Process for Monitoring* the Northern Trust Target Date Funds Was Deeply Flawed and Inconsistent with Standard Industry Practices for Retirement Plan Fiduciaries." *Id.* at 31–82 (emphasis added). Unlike Wermers, Dyson offers no independent quantitative analyses and never discusses why it was imprudent for defendants to stick with the Northern Trust TDFs through a period of strong equity returns, even though defendants could not predict that those conditions would continue.

In opposing defendants' motion for summary judgment, plaintiffs assert that "Dyson's opinions conflict with [Wermers]" and "Defendants' arguments are disputed by an expert opinion." [158] at 7, 44. The fact is, however, that plaintiffs' response never even mentions Wermers' opinions on objective prudence. *See generally* [158]. The Court is therefore not convinced by plaintiffs' argument that the record here represents a "quintessential battle of the experts" precluding it from granting summary judgment. [158] at 7. Even with experts on both sides, plaintiffs must somehow create a genuine dispute on the objective prudence of retaining the Northern Trust TDFs. *See Nat. Res. Def. Council v. Metro. Water Reclamation Dist. of Greater Chi.*, 175 F. Supp. 3d 1041, 1056–57 (N.D. Ill. 2016) ("[T]o the extent that one side's expert opinions are substantially incomplete or inaccurate, they do not create a genuine issue of material fact that precludes summary judgment.") (citing

*NutraSweet Co. v. X–L Eng'g Co.*, 227 F.3d 776, 785 (7th Cir. 2000)). Given the absence of relevant analysis and opinions from Dyson, his report and testimony cannot create a genuine factual dispute on the question of objective prudence.[6]

To be sure, in his report, Dyson does reference "underperformance" by the Northern Trust TDFs compared to universes of other TDFs, concluding that defendants should have removed the Northern Trust TDFs "by at least mid-2014, if not sooner." [157-1] Pl.'s Ex. 1 ¶ 237. In support of this conclusion, Dyson relies on data from Mercer and Willis Towers Watson comparing the Northern Trust TDFs to other universes of TDFs on the market. *See id.* ¶¶ 224–36. Plaintiffs are right that the Northern Trust TDFs often underperformed compared to these universes. But for at least three reasons, no reasonable juror could conclude from this observation that defendants made an objectively imprudent decision in retaining the Northern Trust TDFs.

*First*, Dyson only references the peer universe comparisons from the consultants' reports to support his opinion on the procedural imprudence of retaining the Northern Trust TDFs. For example, after reciting the comparator data from the

---

[6] Plaintiffs' citations to *Snyder v. UnitedHealth Group, Inc.*, No. CV 21-1049 (JRT/DJF), 2024 WL 1076515 (D. Minn. Mar. 12, 2024), and *Spano v. The Boeing Co.*, 125 F. Supp. 3d 848 (S.D. Ill. 2014), do not sway the Court. In *Snyder*, plaintiffs created a genuine dispute by showing defendants waited several years to replace the TDFs after Mercer recommended they "evaluate alternative products"—language which plaintiffs' expert opined "would be understood in the industry as a clear and urgent recommendation to replace" the TDFs. 2024 WL 1076515, at *2, n.3. Likewise, in *Spano*, plaintiffs met their burden by offering evidence that defendants failed to remedy transactional and investment drag associated with the unitized offering. 125 F. Supp. 3d at 872. Neither of these cases involved a situation like here, where plaintiffs rely on an expert to create a factual dispute on objective prudence, even though that expert admitted to not having any opinions as to the objective reasonableness of retaining the investment. *See* [167-1] Def.'s Ex. A at 87:12–19; 88:6–12.

Mercer and Willis Towers Watson reports, Dyson goes on to conclude that the "Plan fiduciaries' failure to take prompt action in the face of demonstrated underperformance constitutes a broad-based failure by the Plan fiduciaries … *to otherwise employ a prudent process* for monitoring plan investments." *Id.* ¶ 237 (emphasis added). As plaintiff's appointed vehicle for establishing defendants' breach of their duty of prudence, it was Dyson's job to explain why the Northern Trust TDFs' underperformance when compared to these peer universes made the investment objectively imprudent. Yet he failed to do so. *See United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010) (at the summary judgment stage, it is "not the district court's job to sift through the record and make [a party's] case for him").[7]

*Second*, as other courts have explained, a TDF's underperformance compared to other funds is insufficient to allege, let alone prove, objective imprudence. In *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1166 (6th Cir. 2022), the Sixth Circuit affirmed a district court's decision to dismiss a complaint alleging a breach of duty

---

[7] In the same vein, although plaintiffs argue that defendants (1) failed to timely evaluate whether the TDFs' glidepath was appropriate for the participants' demographics, (2) ignored data showing the TDFs were unlikely to generate adequate income replacement, (3) ignored the limited market acceptance of Northern Trust TDFs, and (4) ignored Northern Trust's changing investment strategy, *see* [158] at 23–28, plaintiffs only make these arguments in the context of arguing that defendants were procedurally imprudent. Plaintiffs do not explain, for example, why Northern Trust's glidepath was objectively imprudent given participant demographics, or why the changes to Northern Trust's investment strategy were objectively unreasonable. On one occasion, Dyson does criticize the upward-sloping glidepath Northern Trust implemented in 2016 as "very unusual" and "untested," *see* [157-1] Pl.'s Ex. 1 ¶¶ 242, 245, but Dyson does not explain how—or even whether—this strategy caused worse plan performance.

under ERISA, writing that "[m]erely pointing to another investment that has performed better in a five-year snapshot of the lifespan of a fund that is supposed to grow for fifty years does not suffice to plausibly plead an imprudent decision." *Smith* added: "Any other rule would mean that every actively managed fund with below-average results over the most recent five-year period would create a plausible ERISA violation." *Id.*; *see also Jenkins v. Yager*, 444 F.3d 916, 925–26 (7th Cir. 2006) ("We have stated that investment losses are not proof that an investor violated his duty of care."); *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018) (affirming dismissal of complaint alleging a breach of duty under ERISA because "[t]he fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether the Wells Fargo TDFs were an imprudent choice at the outset").

*Third*, the peer universes of funds Dyson cites are inadequate points of comparison. Those comparators included TDFs ranging "from active management to passive and from aggressive to conservative strategies," [155] ¶ 65, and so the Northern Trust TDFs' relative underperformance says little, if anything, about whether these TDFs were meeting their own goals and thus were objectively prudent. In line with other courts, the Court views this analytical flaw as an issue appropriate to address during summary-judgment proceedings (just as it would be appropriate to consider when resolving a *Daubert* motion). For example, in *Pizarro*, the plaintiffs challenged defendant Home Depot's retention of BlackRock's suite of TDFs, which BlackRock had designed to be conservative. *See* 111 F.4th at 1172, 1180–81. In

affirming the district court's decision to grant Home Depot summary judgment, the Eleventh Circuit rejected the comparator TDFs that plaintiff's expert relied on as "apples and oranges." *Id.* at 1180. In doing so, it explained:

> Target date funds are not all created equal—funds from different sponsors may have different glide paths, which means they also have different risk-return profiles. In years when the equity market is hot, a more aggressive target date fund that retains equities longer will appear to outperform a fund that shifts toward more conservative assets like bonds sooner. But that snapshot does not mean it is objectively imprudent to adopt a more conservative strategy—the tables turn when the market is down.

*Id.*

In lieu of the expert's "apples and oranges" comparator TDFs, the court in *Pizarro* found it more relevant that the challenged TDFs' returns closely matched BlackRock's custom indexes that had glidepaths and asset allocations similar to BlackRock's offerings. *Id.* The same is true of this case: Although Northern Trust's TDFs may have underperformed compared to the broader universe of TDF offerings, they almost always performed within a +/- 20 basis tracking band of their custom benchmarks. [155] ¶ 59. This "apples-to-apples comparison" more accurately captures whether the TDFs were performing in line with their specific objectives. *Pizarro*, 111 F.4th at 1180.

Other courts, too, have decided as a matter of law that an "apples to oranges" comparison cannot establish objective imprudence. *See Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 485 (8th Cir. 2020) (affirming dismissal of claim and explaining that different investments "have different aims, different risks, and different potential rewards …. Comparing apples and oranges is not a way to show that one is

better or worse than the other"); *Smith*, 37 F.4th at 1166; *Baumeister v. Exelon Corp.*, No. 21-CV-6505, 2023 WL 6388064, at *5 (N.D. Ill. Sept. 29, 2023) (dismissing complaint challenging TDFs because plaintiffs "failed to plead facts sufficient to support the inference that its six proposed comparators are an appropriate benchmark"); *Luckett v. Wintrust Fin. Corp.*, No. 22-CV-03968, 2024 WL 3823175, at *4 (N.D. Ill. Aug. 14, 2024) (granting motion to dismiss and writing that "courts cannot, and should not, compare apples to oranges when determining a meaningful benchmark for performance").

The parties' dispute over whether the plan's investment strategy was conservative or "middle of the road" does not change this analysis. [168] ¶ 75. Plaintiffs cite to the deposition of one Investment Committee member who testified that defendants wanted to pick a plan "somewhere in the middle," [161-11] Pl.'s Ex. 11 at 107:22, plus an email in which another Investment Committee member noted that the Northern Trust TDFs' glidepath strategy was "middle of the road," [157-120] Pl.'s Ex. 119 at 2. Meanwhile, defendants point to the deposition of a Mercer representative and five other Investment Committee members stating that they intended to choose a conservative plan, plus evidence that Northern Trust did, in fact, design its TDFs with a conservative strategy in mind. *See* [144-1] Def.'s Ex. 36 at 83:20–25; [168-6] Def.'s Ex. 171 at 223:7–8; [168-7] Def.'s Ex. 172 at 94:15–16; [168-8] Def.'s Ex. 173 at 160:3–14, 169:9–15, 204:13–21; [168-11] Def.'s Ex. 176 at 136:4–13; [157-19] Pl.'s Ex. 19 at 73:5–17; [139-3] Def.'s Ex. 38 at ALL0005776; [144-2] Def.'s Ex. 39 at 1. Given the relevant strength of evidence supporting defendants' position,

the Court doubts whether plaintiffs have done enough to create a genuine dispute of fact on this issue. *See Anderson*, 477 U.S. at 252 (a genuine dispute requires more than the "mere existence of a scintilla of evidence in support of the plaintiff's position").

But more fundamentally, even taking as true that defendants intended their strategy to be moderate, Dyson still does not explain why the Northern Trust TDFs' underperformance relative to the broad comparator universes he cites demonstrates imprudence considering a "middle-of-the-road" strategy. Nor does Dyson explain why a comparator group containing actively managed and aggressive funds is sufficient when both parties agree that defendants' strategy was neither of those things. [155] ¶¶ 44, 65, 107.

Although the Court grounds its holding in plaintiffs' lack of appropriate comparator data, two other factors inform its determination that it was objectively prudent for defendants to retain the Northern Trust TDFs. First, defendants contend—and plaintiffs do not dispute—that the TDFs' fees were objectively low. *Id.* ¶¶ 101–02; *see also Pizarro v. Home Depot, Inc.*, 634 F. Supp. 3d 1260, 1298 (N.D. Ga. 2022), *aff'd,* 111 F.4th at 1180–82 (retaining TDFs was objectively prudent in part because the TDF "charged low fees"). And second, although plaintiffs contest that the consultants were ultimately responsible for making plan decisions, *see supra* n.3, the fact remains that both Mercer and Willis Towers Watson consistently blessed the Northern Trust TDFs as a suitable plan option. *See, e.g.*, [140-1] Def.'s Ex. 64 at ALL0017224; [145-1] Def.'s Ex. 59 at ALL0172168; [146-1] Def.'s Ex. 71 at

23

ALL0023473; Def.'s Ex. 56 at ALL0001923; *cf. DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 421 (4th Cir. 2007) ("Although plainly independent advice is not a whitewash, it does provide evidence of a thorough investigation.") (internal citation omitted).

In the end, plaintiffs fail to explain why it was objectively imprudent to retain the Northern Trust TDFs in light of defendants' investment strategy. *See Jenkins*, 444 F.3d at 926 ("Nothing in the record suggests that it was not reasonable and prudent to select conservative funds with long-term growth potential and to stay with those mutual funds even during years of lower performance."); *see also Ellis v. Fid. Mgmt. Tr. Co.*, 883 F.3d 1, 11 (1st Cir. 2018) (granting defendants summary judgment on prudence claim because "plaintiffs lacked any evidence that any of the decisions made by the MIP's managers were unreasonable under the circumstances"). The Court therefore grants summary judgment to defendants on Count I.

### 2. Advisory Services (Count II)

In Count II, plaintiffs contend that defendants breached their fiduciary duty of prudence by retaining Financial Engines and Alight to provide investment advisory services to plan participants beginning on January 4, 2015. [20] ¶ 157; [158] at 32. As with Count I, the Court begins its analysis by determining whether the fees paid for the plan's advisory services were objectively prudent or within the "range of reasonable judgments a fiduciary may make." *Hughes*, 595 U.S. at 177.

As previously discussed, defendants paid for two types of fees to Financial Engines and Alight during the relevant period: fees for the online advice program and fees for professional management services. [168] ¶¶ 86, 90. Online advice fees were

assessed to participants regardless of whether they used them, *id.* ¶ 88, whereas professional management services were only charged if a participant turned over discretionary authority to the provider to manage their account and set asset allocations, *id.* ¶ 91.

When provided by Financial Engines, online advice services were initially $12 per participant per year but later dropped to $6 in 2011. [155] ¶¶ 162, 190; [147-4] Def.'s Ex. 110 at ALL0219756, ALL0219758. In 2017, the plan transitioned to Alight for advisory services. [155] ¶¶ 196–99. As a result of the new contract, the fee for online advice dropped from $6 to $2 per participant per year. *Id.* ¶¶ 199–200; [143-2] Def.'s Ex. 25 at ALL0009135. Under both Financial Engines and Alight, professional management fees were charged to a plan participant based on a fee schedule that varied based on the total assets a participant invested in the program. [143-2] Def.'s Ex. 25 at ALL0009135.

Beginning with the professional management fees, there is no genuine dispute that the fees charged to plan participants for those services were prudent. In 2011, defendants' rate was the lowest across all Financial Engines' clients where participants had to opt in to the services. [155] ¶ 191. Defendants' expert Steven Gissiner concluded that the plan's top-tier fee of 0.45% was less than at least 71% of the top-tier fees of similar plans that used Financial Engines' and Alight's professional management services during the relevant period. *Id.* ¶ 215; [143-2] Def.'s Ex. 27 ¶ 110. Moreover, Gissiner found that the plan's average fee fell at or below the median of Financial Engines' and Alight's fees in every year over the relevant period.

25

[155] ¶ 216; [143-2] Def.'s Ex. 27 ¶ 111. Gissiner ultimately concluded that "the compensation that Financial Engines and Alight received for providing investment advisory and managed account services to the [p]lan was reasonable, appropriate, and compared favorably to fees paid by other plans for similar services performed by Financial Engines and AFA." [143-2] Def.'s Ex. 27 ¶ 153.

In comparison, plaintiffs point to no evidence from which a jury could properly proceed to find in their favor. Relying on comparative data from a request for proposal ("RFP") that defendants issued in 2016 for advisory services, plaintiffs primarily contend that "other managed account providers had more favorable fee schedules for their managed accounts services than those of the Allstate Plan." [158] at 39; [157-1] Pl.'s Ex. 1 ¶ 385. But the fact that one provider offered lower prices says nothing about whether the fees defendants paid were unreasonable in exchange for the services provided. Again, plaintiffs are trying to generate a factual dispute based on what may be, as far as the Court can tell from the record, another apples-to-oranges comparison. *See Smith*, 37 F.4th at 1169 (affirming dismissal because plaintiff "failed to allege that the fees were excessive relative to the services rendered") (cleaned up). Moreover, the Seventh Circuit has "repeatedly emphasized that the cheapest investment option is not necessarily the one a prudent fiduciary would select." *Albert*, 47 F.4th at 579.

Plaintiffs similarly contend that during the 2016 RFP, defendants discovered Alight was offering its professional management services to another company for less than what defendants had agreed to after the RFP. [154] at 40; [157-1] Pl.'s Ex. 1

26

¶ 387. In *Pizarro*, plaintiffs argued that the advisory services fees paid to Financial Engines and Alight were objectively imprudent because the providers "charged higher fees to Home Depot than they did to other comparable clients." 111 F.4th at 1179. The court granted summary judgment in favor of defendants, in part because "Home Depot's top-tier fee, measured in basis points, [was] by no means an outlier when compared to other plans with roughly the same assets." *Id.* It continued: "The fees for half of all plans will, by definition, be worse than the median; a fee somewhat higher than median in a handful of years during the class period is a far cry from being such an objectively unreasonable charge for the providers' services that a prudent fiduciary would not have stayed the course." *Id.* For the same reasons as in *Pizarro*, plaintiffs have not shown a genuine dispute regarding the objective prudence of the professional management fees. Gissiner's report establishes that the fees were "by no means an outlier" compared to those offered to other plans. *Id.* Indeed, Gissiner's report—which plaintiffs do not contradict with their own evidence— suggests that the fees for defendants' plan participants were at or below median each year over the relevant period. [155] ¶ 216; [143-2] Def.'s Ex. 27 ¶ 111.

Plaintiffs' other arguments related to the objective prudence of the professional management fees also fall short. First, plaintiffs offer various testimony from Investment Committee members suggesting that the advisory services were not as personalized as the providers made them out to be. [158] at 36–37. Even taking that proposition as true (although Wermers' report thoroughly disputes it, *see* [144-1] Def.'s Ex. 35 ¶¶ 166–68), plaintiffs still fail to explain why the fees paid exceeded the

value of the services provided.[8] Second, plaintiffs point to Dyson's conclusion that professional management services were "providing little to no value in terms of improved expected returns." [157-1] Pl.'s Ex. 1 ¶ 340; [158] at 38. But the only data Dyson cites in support is one quarterly report from 2014, which shows that participants who used professional management services had lower expected returns than those who did not when subtracting out the average professional management fee. *Id.* ¶ 340. Without a more complete picture of the data, the Court declines to find a material dispute on this basis alone. *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). More fundamentally, plaintiffs cite nothing to suggest that Financial Engines or Alight had promised defendants that their professional management services would yield a particular return on plan participants' investments. A jury therefore would have no basis to assess the objective prudence of the professional management fees against actual outcomes.

Plaintiffs' Count II claim as it relates to the online advice fees fares no better. Plaintiffs primarily argue that the fees were unreasonable because most plan participants never used the services, even though the plan was charged a per-participant fee. [158] at 38; [168] ¶ 108. But plaintiffs have offered no authority for

---

[8] Understood in context, plaintiffs primarily offer this testimony to undermine the procedural prudence of the professional management fees. *See* [158] at 37 (suggesting that the Investment Committee members' "complete lack of understanding" of the advisory services "is due, at a minimum, to a lack of any robust and prudent fiduciary process for monitoring the Plan's service providers").

their contention that the eventual usage rate of optional services bears on whether an upfront, blanket fee for those services is prudent. Nor have they presented evidence that Financial Engines or Alight offered other companies reduced fees based on reduced participation. These deficits are glaring when defendants have offered evidence that the online advice fees were "generally in-line with the fees paid by other [Alight] plans." [143-2] Def.'s Ex. 27 ¶ 114. In 2015 and 2016, Gissiner concluded that the $6 per participant fee was lower than approximately 40% of similar Alight plans. [155] ¶ 218; [143-2] Def.'s Ex. 27 ¶ 114. Gissiner also concluded that from 2017 to 2019, the $2 per participant fee was lower than approximately half of similar Alight plans, and from 2020 to 2021 it was lower than approximately one-third of similar Alight plans. [155] ¶¶ 219–20; [143-2] Def.'s Ex. 27 ¶ 114. Presented with this record, no reasonable jury could conclude that defendants acted in an objectively imprudent way in deciding to pay set fees to Financial Engines and Alight for optional online advice services.

Because Count II fails on objective prudence grounds, the Court has no occasion to discuss whether defendants were procedurally imprudent in maintaining

the advisory services of Financial Engines and Alight.[9] The Court grants summary judgment to defendants on Count II.

## B. Prohibited Transactions (Count III)

In Count III, plaintiffs allege that defendants violated 29 U.S.C. § 1106(a)(1) by causing the plan to engage in prohibited transactions. ERISA's prohibited transactions provision "supplements the fiduciary's general duty of loyalty … by categorically barring certain transactions deemed likely to injure the pension plan." *Albert*, 47 F.4th at 584 (quoting *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241–42 (2000)). The statute provides that:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
>
> …
>
> (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or]
>
> (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan …

---

[9] Plaintiffs also contend that defendants failed to monitor a so-called "kickback" scheme between Aon Hewitt and the advisory services providers (the Court describes this payment scheme in more detail in its discussion of Count III). However, the Court does not address this argument in detail because plaintiffs' brief makes clear that the argument goes only to defendants' procedural prudence in monitoring the plan, not to the objective prudence of the fees themselves. *See* [158] at 42 ("Defendants' lack of knowledge and oversight for fees paid by Plan participants is antithetical to the 'careful and ongoing monitoring' process Dyson opined he would expect of any retirement plan fiduciary."). The Court will note that the mere fact that Financial Engines and Aon Hewitt had a payment arrangement on the back end says little about whether the fees defendants paid for advisory services were reasonable compared to the services rendered. This is especially so given that, at their lowest, the fees only amounted to $2 per participant per year.

29 U.S.C. § 1106(a)(1). ERISA defines a "party-in-interest" of an employee benefits plan as, among other things, a "person providing services to such plan." *Id.* § 1002(14).

Plaintiffs contend that defendants have caused the plan to pay plan assets to Financial Engines—a party in interest—in violation of § 1106(a)(1)(A), (C), and (D). [20] ¶¶ 188–90. They base these claims on what they call a "kickback" scheme between Financial Engines and Aon Hewitt, the plan's recordkeeper. [168] ¶ 114. As part of this scheme, Financial Engines paid 25% to 35% of their professional management fees and 35% of their online advice fees to Aon Hewitt. *Id.* On the surface, these payments (which the contract between Financial Engines and Aon Hewitt called "data connectivity fees") were paid to Aon Hewitt in exchange for Aon Hewitt providing Financial Engines the data it needed to provide advisory services to the plan's customers. *Id.* But plaintiffs contend these fees were also paid to Aon Hewitt as part of an "exclusive marketing arrangement" that did not benefit plan participants. *Id.* For example, as part of the arrangement, Aon Hewitt agreed that Financial Engines would be its "Preferred Provider of advisory services" and provide "[t]arget client data" to Financial Engines to help it grow its book of business. *Id.*

In *Albert*, the Seventh Circuit considered on summary judgment whether allegedly excessive "routine payments for plan services" could be considered prohibited transactions under § 1106(a)(1)(C). 47 F.4th at 583. Although the Circuit suggested that a literal reading of § 1106(a)(1)(C) might prohibit such services, it "declined to read ERISA that way because it would prohibit fiduciaries from paying

31

third parties to perform essential services in support of a plan." *Id.* at 584. It also found that interpreting § 1106(a)(1)(C) to prohibit necessary services would be "inconsistent with the purpose of the statute as a whole" because it would "prohibit transactions for services that are essential for defined contribution plans, such as recordkeeping and administrative services." *Id.* at 584–85.

In *Baumeister*, a court in this district considered whether plaintiffs had stated a prohibited transaction claim under § 1106(a)(1)(C) based a transaction between Financial Engines and the plan's recordkeeper. 2023 WL 6388064, at *11. Like the transaction being challenged here, plaintiffs alleged that Financial Engines "remits a significant percentage of its fees to the recordkeeper" and that Financial Engines' services "were not worth their costs to participants." *Id.* at *2. Attempting to distinguish their claim from *Albert*, plaintiffs urged that the transactions were not *routine* payments for plan services because they were unreasonable and excessive. *Id.* at *11. *Baumeister* rejected this argument, reasoning that "the fact that a plan's routine service payments were excessive or unreasonable does not, on its own, convert the transaction of paying those fees from routine to prohibited." *Id.* Unreasonable or not, it held that the payments were "routine payments for plan services" that, under *Albert*, were not prohibited transactions within the meaning of § 1106(a)(1). *Id.* (citing *Albert*, 47 F.4th at 584–85).

For the same reasons as in *Baumeister*, the Court concludes that the challenged payments to Financial Engines were "routine payments for plan services" falling outside the meaning of a prohibited transaction in § 1106(a)(1). Regardless of

Financial Engines' separate arrangement with Aon Hewitt, the plan paid Financial Engines to provide services to plan customers—namely, the provision of online advice and professional management services. Whether the price paid for those services was unreasonable based on the separate agreement Aon Hewitt had with Financial Engines makes no difference. Under *Albert*, routine services payments are excluded from the definition of a prohibited transaction altogether.

The Court is not otherwise convinced by plaintiffs' citation to *Bugielski v. AT&T Services, Inc.*, 76 F.4th 894 (9th Cir. 2023). There, the Ninth Circuit expressly disagreed with *Albert*'s conclusion that routine payments for plan services are excluded from the meaning of prohibited transaction in § 1106(a)(1), instead concluding that the relevant analysis is whether such payments are exempted from the prohibition under § 1108(b)(2)(A). *See id.* at 901 (referencing § 1108(b)(2)(A) and concluding that "ERISA already contains an exemption for those 'service transactions' that keep plans running smoothly, which are the very transactions AT&T argues should be exempt"); *see also id.* at 908–09 (expressly departing from *Albert*'s reasoning). Although *Bugielski* held that routine payments for plan services should fall under the exemption in § 1108(b)(2)(A), that conclusion is plainly inconsistent with *Albert*'s holding that such payments categorically are not prohibited

transactions under § 1106(a)(1). *Bugielski* does not help plaintiffs so long as *Albert* binds this Court.[10]

The Court grants defendants' motion for summary judgment on Count III.

## C. Co-Fiduciary Duty (Count IV) and Duty to Monitor (Count V)

In Count IV, plaintiffs contend that each defendant is responsible for each other defendant's breach of fiduciary duty pursuant to their co-fiduciary duties in 29 U.S.C. § 1105(a)(1)–3. [20] ¶¶ 196–97. But defendants cannot be liable for breach of co-fiduciary duty if plaintiffs have not met their summary judgment burden on any underlying breach. *See Burke v. Boeing Co.*, 500 F. Supp. 3d 717, 728 (N.D. Ill. 2020), *aff'd*, 42 F.4th 716 (7th Cir. 2022) (citing *Pugh v. Tribune Co.*, 521 F.3d 686, 702 (7th Cir. 2008)). Because the Court grants summary judgment to defendants on Counts I, II, and III, the Court also grants summary judgment to defendants on Count IV.

In Count V, plaintiffs also contend that defendants breached their duty to monitor the performance of the individuals to whom defendants delegated fiduciary responsibilities. [20] ¶ 207. But like their co-fiduciary duty claim, this claim also requires an underlying breach. *See Rogers v. Baxter Int'l Inc.*, 710 F. Supp. 2d 722, 740 (N.D. Ill. 2010) ("Without an underlying breach of fiduciary duty, Rogers's claim

---

[10] Even if *Albert* did not foreclose plaintiffs' claim, the Court has its doubts that defendants can be said to have "caused" the plan to have engaged in a prohibited transaction where the real transaction at issue is between Financial Engines and Aon Hewitt. *See Chendes v. Xerox HR Sols., LLC*, No. 16-13980, 2017 WL 4698970, at *10 (E.D. Mich. Oct. 19, 2017) (dismissing prohibited transaction claim because "the plan was not a party to the Xerox-FE Agreement, and therefore the Defendant could not have 'cause[d] the plan to engage in a transaction' with FE as required by [§ 1106(a)]").

34

for failure to monitor fails on its merits."). Because none of plaintiffs' underlying claims survive, summary judgment is also granted to defendants on Count V.

CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary judgment [136] on all counts and as to all defendants. Civil case terminated.

_____
Georgia N. Alexakis
United States District Judge

Date: 1/27/25